**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

JERRY LEE PITTS,

        Claimant,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Respondent.

\*

\*

\*

\*

\*

CASE NO. 5:06-CV-166 (WDO)
Social Security Appeal

## REPORT AND RECOMMENDATION

The Social Security Commissioner, by adoption of the Administrative Law Judge's

determination, denied Claimant's application for social security disability benefits, finding

that he was not disabled within the meaning of the Social Security Act and Regulations.

Claimant contends that the Commissioner's decision was in error, and he seeks review under

the relevant provisions of 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c). All administrative

remedies have been exhausted.

## LEGAL STANDARDS

The court's review of the Commissioner's decision is limited to a determination of

whether it is supported by substantial evidence and whether the correct legal standards were

applied. *Walker v. Bowen*, 826 F.2d 996 (11th Cir. 1987). Substantial evidence is defined

as more than a scintilla and means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S. Ct. 1420,

28 L. Ed. 2d 842 (1971). The court's role in reviewing claims brought under the Social

Security Act is a narrow one. The court may not decide facts, reweigh evidence, nor substitute its judgment for that of the Commissioner.[1] *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). It must, however, decide if the Commissioner applied the proper standards in reaching a decision. *Harrell v. Harris*, 610 F.2d 355, 359 (5th Cir. 1980). The court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings. *Bloodsworth v. Heckler*, 703 F.2d at 1239. However, even if the evidence preponderates against the Commissioner's decision, it must be affirmed if substantial evidence supports it. *Id.* The initial burden of establishing disability is on the claimant. *Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973). The claimant's burden is a heavy one and is so stringent that it has been described as bordering on the unrealistic. *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).

A claimant seeking Social Security disability benefits must demonstrate that he suffers from an impairment that prevents him from engaging in any substantial gainful activity for a twelve-month period. 42 U.S.C. § 423(d)(1). In addition to meeting the requirements of these statutes, in order to be eligible for disability payments, a claimant must meet the requirements of the Commissioner's regulations promulgated pursuant to the authority given in the Social Security Act. 20 C.F.R. § 404.1 et seq.

Under the regulations, the Commissioner determines if a claimant is disabled by a

---

[1]Credibility determinations are left to the Commissioner and not to the courts. *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991). It is also up to the Commissioner and not to the courts to resolve conflicts in the evidence. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). See also *Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986).

five-step procedure. 20 C.F.R. § 404.1520, Appendix 1, Part 404. First, the Commissioner determines whether the claimant is working. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities. Next, the Commissioner determines whether the claimant's impairment(s) meets or equals an impairment listed in Appendix 1 of Part 404 of the regulations. Fourth, the Commissioner determines whether the claimant's residual functional capacity can meet the physical and mental demands of past work. Finally, the Commissioner determines whether the claimant's residual functional capacity, age, education, and past work experience prevent the performance of any other work. In arriving at a decision, the Commissioner must consider the combined effect of all the alleged impairments, without regard to whether each, if considered separately, would be disabling. *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984). The Commissioner's failure to apply correct legal standards to the evidence is grounds for reversal. *Id.*

**ISSUES**

**I.     Whether the ALJ failed to properly evaluate the Claimant's GAF scores?**

**II.    Whether the ALJ failed to carry the Commissioner's Step 5 burden?**


**Administrative Proceedings**

Claimant filed an application for Supplemental Security Income payments on August 14, 2001. (T-18). Claimant's application was denied on initially and on reconsideration. *Id.* Claimant then filed a request for a hearing, which was held on August 26, 2003. *Id.*

Subsequent to the hearing, the ALJ found that the Claimant was not disabled in a decision dated December 20, 2003. (T-18-25). Claimant then requested a review of the ALJ's findings by the Appeals Council. Thereafter, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (T-4-7).

## Statement of Facts and Evidence

Claimant alleges that he is disabled due to depression, anxiety, alcohol abuse, seizure, arthritis in his hands, and decreased left eye vision. After examining the medical records, the ALJ determined that Claimant had cervical and degenerative disc disease, degenerative changes and tendonitis of the left shoulder, decreased vision of the left eye, a seizure disorder, alcoholism, and chronic bronchitis, impairments that are severe within the meaning of the Regulations but not severe enough to meet, or medically equal, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (T-20). Thereafter, the ALJ found that Claimant had the residual functional capacity to perform a significant range of light work and that Claimant would be unable to return to his past relevant work. (T- 24-25). The ALJ found, however, that there were a significant number of jobs that Claimant could perform in the national economy, thus determining that Claimant was not disabled.

## DISCUSSION

**I.     Whether the ALJ properly evaluated the Claimant's GAF scores?**

While the Claimant concedes that the ALJ's physical RFC finding is supported by

substantial evidence, Claimant urges that substantial evidence does not support the decision of the Commissioner regarding Claimant's mental impairments. Specifically, Claimant contends that the ALJ erred in failing to consider Claimant's GAF scores.

In his Findings, the ALJ determined that Claimant's allegation of depression was not a "severe" and disabling impairment. The ALJ found that the alleged impairment (1) had not met the durational requirement or was episodic in nature; (2) had not been substantiated by any objective medical evidence and/or laboratory techniques; or (3) was corrected or controlled by medication, treatment, surgery, or diet. (T-20). The ALJ further found that the alleged depression had less than a minimal effect upon Claimant's ability to perform work-related functions, and consequently, the alleged impairment was "non-severe" within the regulatory definition (20 C.F.R. § 416.921, § 416.929(d)(3) and Social Security Ruling 96-3p). *Id.*

Claimant cited to six pages of medical records where Claimant's GAF was mentioned. (R-12, p. 8). In citing to instances when Claimant's GAF was "as low as 30," Claimant cited to pages 290, 293, and 302. *Id.* The record at page 302, is dated March 5, 2001, the date Claimant was admitted to River Edge Behavioral Health Center for detoxification from alcohol dependence. (T-302). On that date, Claimant was admitted with an Axis I diagnosis of Alcohol Dependence (DSM- IV-TR 303.9) with no mention or diagnosis of depression. *Id.* The record at page 293 is dated March 7, 2001, just two days after Claimant was admitted for detoxification. (T-293). The Axis I diagnosis includes both Alcohol Dependence and Major Depression. *Id.* However, the medical record indicates that:

5

Claimant's appearance was appropriate; he was cooperative in the interview; Claimant's psychomotor activity and speech were normal; his associations were logical; his thought content was appropriate; Claimant denied hallucinations and delusions; there were no homicidal or suicidal ideations; Claimant was oriented as to time, place, person and situation; there was no memory impairment; Claimant's insight and judgment/reasoning were average; and Claimant denied any psychological history. *Id.* There is no indication, whatsoever, on this document that Claimant's GAF was related to depression and not his alcohol dependency. Claimant lists the medical record at page 290, as the third example of his GAF at a low of thirty. (T-290). The date of this medical record is March 9, 2001, just four days into Claimant's treatment for detoxification. *Id.* Again the Axis I diagnosis includes both Alcohol Dependence and Major Depression, in that order. *Id.* However, the form boxes checked on the medical record indicate that: Claimant's appearance was appropriate; he was cooperative in the interview; his mood was elated; Claimant's psychomotor activity and speech were normal; his associations were logical; his thought content was appropriate; Claimant denied hallucinations and delusions; there were no homicidal or suicidal ideations; Claimant was oriented as to time, place, person and situation; there was no memory impairment; Claimant's insight and judgment/reasoning were average; and Claimant denied any psychological history or problems. *Id.* Again, the record does not attribute the GAF score to Claimant's depression and not his alcohol dependency, and the severity of

6

Claimant's current episode or current remission status of the disorder was unspecified.[2]

Claimant also refers to pages 279, 296, and 301 of the transcript when discussing Claimant's highest GAF scores. (R-12, p. 8). On March 19, 2001, two weeks after Claimant was admitted to River Edge for detoxification, Claimant's GAF score was listed at 50 on the mental status record. (T-279 and 296). The Axis I diagnosis includes both Alcohol Dependence and Major Depression, in addition Claimant was noted as having alcohol related seizures. *Id*. However, the form states that Claimant's current complaint is "drinking daily" and further states that: Claimant's appearance was appropriate; he was cooperative in the interview; his mood/affect was appropriate; Claimant's psychomotor activity and speech were normal; his associations were logical; his thought content was appropriate; Claimant denied hallucinations and delusions; there were no homicidal or suicidal ideations; Claimant was oriented as to time, place, person and situation; there was no memory impairment; Claimant's insight was listed as poor; his calculation was listed as average; and his judgment/reasoning was listed as impaired. Claimant was listed as seeking treatment for alcohol dependency, and did not list a complaint for depression, nor was a treatment plan for depression discussed in the medical record. *Id*. Again, there is no indication, whatsoever, on this document that Claimant's GAF was related to depression, in fact, the record indicates that his treatment is focused on his alcohol dependency. *Id*.

---

[2]   In the medical record in question, Claimant's depression is listed at 296.30. (T-290). "If the severity of the current episode or the current remission status of the disorder is unspecified, the fifth digit is 0. DSM-IV-TR p. 370.

The record at page 301 appears to be dated August 21, 2001, approximately five and a half months after Claimant was admitted to River Edge for detoxification. (R-301). On that date, Claimant's primary Axis I (one) was listed as Major Depression and his secondary Axis I (one) was listed as Alcohol Dependence. *Id.* Claimant contends that by this date, he had abstained from the use of alcohol since March 5, 2001. (R-14, p. 8). The medical record, however, belies Claimant's argument. On April 17, 2001, Claimant arrived at day treatment with phenobarbital pills in his pocket and smelling of alcohol. (T-176). When tested, Claimant blew a 0.144 on the alcosensor and was transported to the recovery center for detox. *Id.* On April 19, 2001, Claimant presented at River's Edge with a BAC of 0.144, had glazed eyes, was shaky, unsteady, incoherent, and illogical. (T-266, 301 [3]). Claimant was again referred for detoxification. *Id.* On April 25, 2001, Claimant presented to the treatment program for the first time since "detox episode" on Saturday, April 21, 2001. (T-176). Claimant smelled strongly of alcohol, registered 0.119 on the alcosensor, and was referred back to detox. *Id.*

In addition to Claimant's use of alcohol, the medical records indicate that Claimant was also abusing medication. On March 28, 2001, Claimant was admitted to detoxification for "suspected substance abuse" of hydrocodone (Lortab). (T-177, 178). On March 31, 2001, the nurses's notes from River Edge Behavioral Center indicate that Claimant remained

---

[3] The medical record cited by Claimant to show his abstention from alcohol for six months, itself shows that the date of his last admission was April 19, 2001. (T-301). In addition, in a record dated August 22, 2001, the treatment personnel noted that Claimant admitted to having used drugs and/or alcohol within the past two weeks. (R-205).

on phenobarbital detoxification. (T-175). On April 1, 2001, the nurse's note indicates that Claimant is being discharged from the day program and being voluntarily admitted to the recovery center for detox due to Claimant's ingestion of 15 Lortab. *Id.*

On May 30, 2001, the group director at River Edge noted Claimant had no depression. (T-248). On June 1, 2001, Claimant denied any depression. (R-247). On June 13, 2001, Claimant expressed concern about either getting a job or reapplying for Social Security and denied depression to treatment personnel. (R-241). On June 14, 2001, Claimant related that he had a positive or improved mood and decreased depression to treatment personnel. (T-240). On June 20, 2001, the treatment provider noted that Claimant had a positive attitude, was grateful to be sober, Claimant denied any suicidal or homicidal ideations and denied any auditory or visual hallucinations. (R-237). There was no other mention of depression or symptoms of depression during this time of treatment. On June 27, 2001, Claimant was transferred to Day Treatment. (R-234). On July 2, 2001, the treatment personnel at the day treatment program at River Edge prioritized Claimant's therapeutic needs as 1) Major Depression and 2) Alcohol Dependence. (R-230-231). The justification/rationale for the service choice stated:

> Client not sleeping well and has poor appetite along with [decreased] energy, has been depressed for past 3 years, due to death of Brother and loss of vision in [left] eye, client was first [treated] for depression at VA. Put on Paxil but was noncompliant with meds (sic) and started drinking which ended by him becoming more depressed and going to Detox Center for help.

*Id.* The expected transition or discharge date was listed as September 30, 2001. *Id.*

9

On July 31, 2001, Dr. Fred Girton of the Family Health Center saw Claimant for the first time. (R-168). Claimant's main complaint was that he did not speak like he used to. *Id*. Claimant's mother informed Dr. Girton that for the past one to one and a half months, Claimant had been somewhat unstable, sleepy, lethargic, with disjointed walking, and seemed to be in a daze. *Id*. Dr. Girton noted that Claimant was on multiple medications, many of which could cause the symptoms described by Claimant and his mother. *Id*. Dr. Girton scheduled several tests, including a check of Claimant's phenobarbital level and ordered a follow-up in one week. (T-169). Dr. Girton saw Claimant again on August 2, 2001. (T-167). Dr. Girton was informed that Claimant had been taking phenobarbital for a "seizure disorder." *Id*. At that time, Dr. Girton did not have Claimant's medical records and did not know why Claimant had been prescribed phenobarbital by his family physician. *Id*. Dr. Girton noted that Claimant was supposed to take 60 m.g. three times a day but Claimant "was taking much more than that, in fact, taking three and four at a time." *Id*. Claimant was developing lethargy, was not feeling well and was developing an abnormal sleep pattern when he appeared for treatment two days prior. *Id*. When Claimant's phenobarbital level was found to be 95.1, a critical level, Claimant was instructed to stop taking the phenobarbital, but he did not. *Id*. At his appointment on August 2, 2001, Claimant continued to feel lethargic and did not feel himself. *Id*. On August 6, 2001, Claimant was examined by Dr. Lenka Novotna of the Family Health Center for a follow-up appointment regarding Claimant's phenobarbital overdose. (T-165). Dr. Novotna noted that Claimant had a "past history of alcohol abuse with withdrawal seizures, for which the

10

phenobarb (sic) was quite appropriately started as part of his detox by Dr. Patrice Sapp." *Id*.

Dr. Novotna further noted that Claimant had been alcohol free and on antabuse for two

months. *Id*. Dr. Novotna stated that Claimant had been placed on phenobarbital three times

daily but noted that Claimant had been using the phenobarbital as often as necessary

whenever he felt slightly nervous. *Id*. Dr. Novotna noted that the abuse of phenobarbital by

Claimant led him to have a critical level of 95.1, a week prior. *Id*. Claimant was instructed

to stop taking phenobarbital at his initial visit but did not do so. *Id*. On August 13, 2001,

Dr. Novotna again completed a follow-up evaluation of Claimant due to his phenobarbital

overdose. (T-163). Dr. Novotna stated, "The patient has been abusing phenobarbital and

had several critical levels. He has been counseled several times in our office that he needed

to stop his phenobarbital because he now did not have risk of withdrawal seizures since he

has been off alcohol for over two months." *Id*. Dr. Novotna also stated that she would

probably call Claimant's treatment program to inform them that Claimant was developing

an addiction to phenobarbital to replace his alcohol addiction. *Id*.

At the River Edge Day Program, on August 22, 2001, Claimant admitted to using

alcohol within the last two weeks. (T-205). Although there were reports of depressed affect,

Claimant reported no depression on either the 29th or 30th of August. (T-201). On September

7, 2001, Claimant reported his depression level to be 1 out of 10 (with ten being the highest

on scale) and reported eight hours sleep. (T-197). On September 11th and 12th, it was noted

that Claimant's mood/affect was blunted, but Claimant reported a full eight hours sleep. (T-

196). On September 14, it was noted that Claimant was responding well to current

medication and that he reported improvement in mood, energy level and sleep. (T-195). On

September 17, 2001, Claimant reported his depression level to be 1 out of 10 (with ten being

the highest on scale). (T-193). Claimant reported sleeping eight hours and verbalized

sadness about his brother's death, but stated "it no longer bothers me a lot anymore." *Id*.

On September 18, 2001, the counselor noted that Claimant's thought process had improved,

he had good impulse control, and that Claimant reported no depression or anxiety. *Id*. On

September 21, 2001, it was noted that Claimant's affect was flat but that Claimant was

compliant with medication. (T-194).

The medical records from River Edge Behavioral Health Center indicate that Claimant

was referred to the recovery center on September 25, 2001, for detox after presenting to the

group session smelling of alcohol. (T-192). Claimant's breath test reported a BAC of 0.14.

*Id*. Claimant was discharged from the recovery center on September 29, 2001, after

completing phenobarbital detoxification. (T-188). Claimant was returned to peer counseling

at that time with an Axis I diagnosis of Alcohol Dependence and Major Depression, in that

order. *Id*. On that date, Claimant also admitted to drinking alcohol over the weekend and

registered 0.14 on the sensor. (T-189).

It is the responsibility of the ALJ to determine if an impairment is severe under the

disability guidelines. That determination must be made using the definitions given in the

regulations. Code section 416.905 provides the basic definition of disability for adults

seeking supplemental security income. 20 C.F.R. § 416.905. Disability is defined as:

> (a) . . . the inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death **or which has lasted or can be expected to last for a continuous period of not less than 12 months**.

*Id.* (emphasis added). This is called the "duration requirement" and it is a basic element that Claimant must prove before he can be declared disabled. 20 C.F.R. §§ 416.905 and 416.909. Claimant has failed to meet that burden. As there is no evidence in the medical record to indicate that Claimant's depression lasted a continuous period of not less than twelve months to meet the durational requirement[4], there is no reason the ALJ must discuss a specific GAF score from a non-qualifying alleged impairment. 20 C.F.R. §416.927(d).

Furthermore, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements [of the] mental disorders listings." 65 Fed. Reg. 50746, 50764-65 (2000). Thus, although GAF scores can be helpful in an ALJ's decision making process, they are not determinative.

Additionally, the psychological evaluation of Claimant supports the determination of the ALJ. On January 24, 2002, M. Eugene Scarboro, Ph.D., completed a psychological evaluation of Claimant. (T-478-480). In evaluating Claimant's mental status, Dr. Scarboro

---

[4] Claimant's diagnosis at River Edge Behavioral Health Center on March 25, 1999, was Alcohol Dependence only, in fact, Claimant denied any psychiatric history or problems. (T-354-346). Claimant's diagnosis at River Edge Behavioral Health Center on November 16, 1998, was Alcohol Dependence with a GAF of 45, there was no mention of depression. (T-370).

noted:

> The claimant arrived for this evaluation at the appointed time. He is of medium height and normal weight for his height and stature. In appearance, the claimant was properly groomed, and he was dressed casually without any marked unkemptness. He ambulated with normal gait, and there were no unusual mannerisms, motor tics, or psychomotor excitement. The claimant was fully cooperative, and he related to the examiner in a polite and respectful manner. Eye contact was not avoided, and rapport was established. Speech was of normal rate and volume, and the claimant enunciated intelligibly. He articulated his thoughts and feelings adequately.
>
> **The claimant's mood and affect did reveal some dysthymic mood, and this is no doubt associated with his primary alcoholism**. There were no signs or reports of auditory or visual hallucinations, and delusions of a paranoid, persecutory, or grandiose nature were not revealed. No bizarre sensory or perceptual phenomena were identified. Thought processes and verbalizations revealed no incoherence, irrelevance, loosening of associations, thought racing or blocking, perseveration, or other signs of a formal thought disorder.
>
> The claimant does appear to be of below average intelligence, but he now has good insight regarding his alcohol addiction. Judgment is not impaired at this time, though it is certainly influenced by alcohol dependence. There remains risk of relapse. Memory is intact.

(T-479) (emphasis added). Dr. Scarboro concluded that Claimant's Axis I diagnosis was "Alcohol Dependence, Chronic, Early Remission" and that his Axis II diagnosis was "Probable Borderline Intelligence." (T-480). Although he was aware of a possible earlier diagnosis of depression, Dr. Scarboro did not find such during his evaluation. (T-478-480). In fact, Dr. Scarboro related Claimant's dysthymic mood to his alcoholism. The medical records themselves reflect that Claimant's GAF scores were low during the detoxification

14

process and while he was drinking or abusing medication. In addition, Dr. Scarboro's finding regarding dysthymia supports a determination that the GAF scores related to Claimant's addictions and not depression. Thus, the GAF scores cited by Claimant were not reflective of an ongoing battle with depression, but with addiction during the specified time.

In his Reply Brief, Claimant argues for the first time that the Commissioner violated the "treating physician rule" regarding the GAF scores. It is well settled that the opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding it. *Broughton v. Heckler*, 776 F.2d 960, 961-62 (11th Cir. 1985). A treating physician's report may be discounted when it is not accompanied by objective medical evidence or when it is conclusory. *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). The ALJ can also reject the opinion of any physician when the evidence supports a contrary conclusion or when it is contrary to other statements or reports of the physician. *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991). *See also Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984). The weight afforded a medical source's opinion on the issue(s) of the nature and severity of a claimant's impairments depends upon; the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the evidence the medical source submitted to support an opinion, the consistency of the opinion with the record as a whole, the specialty of the medical source and other factors. 20 C.F.R. §416.927(d).

Even if the GAF scores are considered to be an "opinion," they were not supported by objective medical testing or evidence. There was no objective medical evidence in the

record to support even an inference, as no statement was made by the treating personnel, that the GAF scores were related to the alleged depression and not the alcohol dependence. Also, as previously stated, Claimant failed to meet the durational requirement. A medical "opinion" on the severity of an impairment will not cure a Claimant's failure to show that an alleged impairment lasted continuously for twelve months or more. Furthermore, the GAF scores cited by Claimant during the six month period at River Edge were within days of Claimant's detoxification for substance abuse and/or during a time when Claimant was still abusing alcohol or medication. Thus, for the foregoing reasons, Claimant's argument is without merit.

## II.     Whether the ALJ failed to carry the Commissioner's Step 5 burden?

Claimant contends that substantial evidence does not support the decision of the Commissioner because the ALJ failed to ask the vocational expert about the mental limitations signified by Claimant's GAF scores. (R-12, p.10). As it has been determined that Claimant's prior argument of error regarding the GAF scores was without merit, it follows that the ALJ did not err by failing include such in his hypothetical question.

### CONCLUSION

In reviewing the record, no evidence of error is found to substantiate the Claimant's contention that the ALJ failed to consider Claimant's GAF scores and improperly evaluated evidence related to Claimant's alleged depression. This Court further finds that the ALJ properly carried the Commissioner's Step-5 burden and finds further that the decision of the ALJ is supported by substantial evidence. Furthermore, the record fails to reveal evidence

of the ALJ acting outside of his judicial role in determining the extent of the Claimant's disability.

**WHEREFORE**, it is the recommendation to the United States District Judge that the decision of the defendant Commissioner of Social Security be **AFFIRMED**. Pursuant to 28 U.S.C. § 636(b)(1), Claimant may serve and file written objections to this recommendation with the UNITED STATES DISTRICT JUDGE within ten (10) days after being served a copy of this recommendation.

THIS the 26th day of September, 2007.

S/ G. MALLON FAIRCLOTH
UNITED STATES MAGISTRATE JUDGE

mZc